

# In the
# Missouri Court of Appeals
## Western District

| | |
|---|---|
| **VILLAGE OF BIG LAKE, MISSOURI,** ) | |
| ) | |
| **Appellant,** ) | WD77016 |
| ) | |
| v. ) | OPINION FILED: June 3, 2014 |
| ) | |
| **BNSF RAILWAY COMPANY, INC.** ) | |
| **AND MASSMAN CONSTRUCTION** ) | |
| **CO.,** ) | |
| ) | |
| **Respondents.** ) | |

**Appeal from the Circuit Court of Holt County, Missouri**
The Honorable Roger M. Prokes, Judge

Before Division Three:  Thomas H. Newton, Presiding Judge, Mark D. Pfeiffer, Judge
and Cynthia L. Martin, Judge


Village of Big Lake, Missouri ("Big Lake") appeals from the trial court's grant of summary judgment in favor of BNSF Railway Company, Inc. ("BNSF") and Massman Construction Co. ("Massman") (collectively "Respondents").  The Respondents claimed that language in permit agreements between Big Lake and BNSF's predecessor, Burlington Northern Railroad, released Big Lake's claims for negligence and trespass relating to damage to Big Lake's underground water lines and a fire hydrant.  Because genuine issues of material fact as to which Respondents bear the burden of proof and

persuasion remain in dispute, the entry of summary judgment is precluded as a matter of law. We reverse and remand to the trial court for further proceedings.

## Factual and Procedural History

On May 13, 2013, Big Lake filed a two count petition against BNSF and Massman alleging negligence and trespass. Big Lake alleged that in the summer of 2011, following a flood, Massman performed work for BNSF on a rail line near the southern boundary of Big Lake. Big Lake alleged that Massman used an excavator to repeatedly chop into the ground to pull a floating repair barge through flood waters, cutting Big Lake's underground water line in five different locations. Big Lake also alleged that Massman destroyed a fire hydrant by covering it with fill material.

In lieu of filing an answer,[1] Respondents filed a joint motion for summary judgment, accompanying suggestions in support, and a statement of uncontroverted facts.[2] The Respondents argued that Big Lake and Burlington entered into two pipeline permit agreements in 1991 which authorized Big Lake to place its water lines "upon, along, or across the right-of way" of the rail line at two specifically identified locations, and that these agreements contained language releasing any claims Big Lake had for damage to the water line or other Big Lake property.

---

[1]Big Lake filed a motion for default judgment on the theory that Respondents had never filed an answer to the petition and instead filed a motion for summary judgment to assert the defense of release. The trial court denied the motion.

[2]Big Lake failed to include the motion for summary judgment and related pleadings in the legal file on appeal in violation of Rule 81.12 warranting dismissal of the appeal. *Snelling v. Southwestern Bell Telephone Co.,* 996 S.W.2d 601, 603 (Mo. App. W.D. 2005). However, the Respondents filed a supplemental legal file including these documents. In view of our policy to decide a case on its merits rather than its technical defects, we elect not to dismiss the appeal on this basis. *Id.*

Big Lake opposed the motion for summary judgment, though it admitted the majority of the uncontroverted facts set forth in the motion. The admitted uncontroverted facts establish the following:

● Big Lake is a Missouri municipality located in Holt County, Missouri. BNSF operates and maintains an intercontinental railroad, including a line near the southern boundary of Big Lake. In the summer of 2011, a flood occurred at or around the Big Lake area. At all pertinent times, Big Lake has operated and maintained a water line at or near the southern boundary of Big Lake. This water line goes through and under BNSF tracks at two separate points. Massman entered into a contractual relationship with BNSF in which Massman agreed to perform work on the BNSF rail line in the Big Lake area at BNSF's direction.

● On November 5, 1991, Big Lake entered into two permit agreements with BNSF's predecessor, Burlington. In these pipeline permits, BNSF's predecessor allowed Big Lake, in consideration for a fee and for the covenants and promises made in the permits, to construct and operate its water line, upon, along, or across the BNSF right of way, underneath the surface thereof, and under and along the BNSF tracks. Pipeline permit No. PX-91-8090 allows Big Lake "license and permission to excavate for, construct, maintain, and operate one (1) water line under our Burlington tracks near MP 4.66 Survey Station 244 + 84." Pipeline permit No. PX-91-8091 allows Big Lake "license and permission to excavate for, construct, maintain, and operate one (1) water line under our Burlington tracks near MP 5.73 Survey Station 301 + 22." Both permits referred to the specific water line location therein described as: "Facility upon, along or

3

across the right-of-way of Burlington, underneath the surface thereof, and under and along the tracks of Burlington, as the case may be . . ."

● Paragraph 7 of both of the pipeline permits provides:

Permittee shall and hereby releases and discharges Burlington of and from any and all liability for damage to or destruction of said Facility, and any other property of Permittee located on or near Burlington's premises, and shall and hereby assumes any and all liability for injury to or death of any and all persons whomsoever, including officers, employees, and agents of the parties hereto, and loss of or damage to property to whomsoever belonging, including property owned by, leased to, or in the care, custody, and control of the parties hereto, in any manner arising from or during the excavation for, construction, reconstruction, use, maintenance, repair, or removal of said Facility, however such injury, death, loss, damage, or destruction aforesaid may occur or be caused, and shall and hereby does indemnify and save harmless Burlington of and from any and all claims, demands, suits, actions, damages, recoveries, judgments, costs, or expenses arising or growing out of or in connection with any such injury, death, loss, damage, or destruction aforesaid. Permittee further agrees to appear and defend in the name of Burlington any suits or actions at law brought against Burlington on account of any such personal injury or death, and loss and damage to or destruction of property, and to pay and satisfy any final judgment that may be rendered against Burlington in any such suit or action. THE LIABILITY ASSUMED BY PERMITTEE SHALL NOT BE AFFFECTED BY THE FACT, IF IT IS A FACT, THAT THE LOSS, DAMAGE, DEATH, OR INJURY WAS OCCASIONED BY OR CONTRIBUTED TO BY THE NEGLIGENCE OF BURLINGTON, ITS AGENTS, SERVANTS, EMPLOYEES, OR OTHERWISE.

● The pipeline permits provide that BNSF may cancel and terminate the license and permission extended to Big Lake upon thirty days written notice. Big Lake continues to operate and maintain its water lines pursuant to the pipeline permits.

● Following the flooding of 2011, BNSF and Massman undertook a massive effort to return the BNSF tracks in the Big Lake area to service. Big Lake alleges that during this repair work, BNSF and Massman covered or destroyed a water line and a fire

4

hydrant belonging to Big Lake. Big Lake alleges that the damage to its water line at the intersection of Cemetery Road was 175 feet from BNSF's center track, and 200 feet from the BNSF East and West Center Line. Big Lake further alleges that the damaged fire hydrant was located at the Highway 111 track intersection, approximately 53 feet from the center track.

Big Lake denied only two of the "uncontroverted facts" set forth in the Respondents' motion. Big Lake denied the Respondents' statement that "Paragraph 7 of both pipeline permits releases BNSF from any liability for damage or destruction of the water line," noting the statement was not a contention of fact, but instead a legal conclusion. Big Lake also denied as a legal conclusion Respondents' statement that "[t]he pipeline permits place the responsibility for the construction, reconstruction, repair, or maintenance of the water lines solely upon Big Lake."[3] Big Lake did not set forth any additional material facts remaining in dispute in the manner required by Rule 74.04.[4]

Big Lake contested the Respondents' right to summary judgment as a matter of law. Big Lake argued that the damage to the water line and fire hydrant (which was alleged to have occurred anywhere from 53 to 200 feet from the tracks) was not within the scope of the release because the damage was not "on or near" BNSF's premises. Big Lake argued that the release did not use the words "negligence" or "fault" or their equivalents as required by the Supreme Court's decision in *Alack v. Vic Tanney*

---

[3]We agree with Big Lake that the two uncontroverted facts it denied were legal conclusions, and not assertions of fact. Legal conclusions set forth as "uncontroverted facts" in a motion for summary judgment are not binding on the non-movant or the court. *Rycraw v. White Castle Systems, Inc.*, 28 S.W.3d 495, 498 (Mo. App. E.D. 2000).

[4]Rule 74.04(c)(2) permits a response to a motion for summary judgment to "set forth additional material facts that remain in dispute, which shall be presented in consecutively numbered paragraphs and supported in the manner prescribed by Rule 74.04(c)(1)."

*International of Missouri, Inc.*, 923 S.W.2d 330 (Mo. banc 1996), rendering the release invalid as a matter of law to release Big Lake's negligence claim. Big Lake argued that the release was unenforceable to release Big Lake's claims of trespass and gross negligence, future claims which cannot be released as a matter of law pursuant to *Alack*. Finally, Big Lake argued that it was not a sophisticated party as "it is a small town that is rarely involved in matters such as these, while the railroad regularly enters in to these types of contracts."

In their reply suggestions, the Respondents acknowledged that the requirements for release of future negligence claims are different for a consumer than for sophisticated parties, and argued that the release was negotiated between sophisticated parties. The Respondents alternatively argued that the language in the release satisfies the requirements for consumer transactions set forth in *Alack* because it is "clearly stated and explicit."

On November 7, 2013, the trial court entered an amended judgment granting the Motion for Summary Judgment.[5] Big Lake appeals.

### Standard of Review

"Appellate review of the grant of summary judgment is *de novo*." *Dilley v. Valentine*, 401 S.W.3d 544, 547-48 (Mo. App. W.D. 2013) (citing *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993)). "We review the record in the light most favorable to the party against whom the judgment was

---

[5]On October 7, 2013, the trial court entered an *order* granting the Motion for Summary Judgment. The November 7, 2013 amended judgment substituted "amended judgment" for the word "order" in the title.

6

entered." *Jordan v. Peet*, 409 S.W.3d 553, 557 (Mo. App. W.D. 2013). "'Summary judgment is appropriate when the moving party has demonstrated, on the basis of facts to which there is no genuine dispute, a right to judgment as a matter of law.'" *Id.* (quoting *Roberts v. BJC Health System*, 391 S.W.3d 433, 437 (Mo. banc 2013)).

> The defendant establishes the right to judgment as a matter of law by showing one of the following: (1) facts negating any one of the claimant's elements necessary for judgment; (2) that the claimant, after an adequate period of discovery, has not been able to—and will not be able to—produce evidence sufficient to allow the trier of fact to find the existence of one of the claimant's elements; or (3) facts necessary to support his properly pleaded affirmative defense.

*Id.* "We will affirm a summary judgment under any theory supported by the record." *Id.* "However, 'where it is unclear from the summary judgment record that a basis exists for the grant of summary judgment, we will reverse.'" *Id.* (quoting *Cody v. Mo. Bd. of Prob. & Parole*, 111 S.W.3d 547, 552 (Mo. App. W.D. 2003)). "'An abundance of caution must be exercised in granting a motion for summary judgment because it is an extreme and drastic remedy that borders on the denial of due process because the opposing party is denied its day in court.'" *Id.* (quoting *Bank of Am., N.A. v. Reynolds*, 348 S.W.3d 858, 860 (Mo. App. W.D. 2011)).

## Analysis

Big Lake raises four points on appeal. Big Lake contends that the trial court erred because the claims alleged in Big Lake's petition were not released in that (1) the liability waiver in the pipeline permits did not explicitly mention that it waived negligence; (2) the petition contained a well-pled claim for trespass, an intentional tort, which cannot be released in advance under Missouri law; (3) the petition contained a well-pled claim for

7

gross negligence which cannot be released in advance under Missouri law; and (4) the basis for the summary judgment was an affirmative defense which was not first raised in a responsive pleading. Big Lake's first point relied on is dispositive of this appeal.

Big Lake contends that paragraph 7 of the pipeline permits was ineffective to release its claim of negligence pursuant to the Supreme Court decision in *Alack* because it did not explicitly mention that it waived negligence. In *Alack*, the plaintiff was injured using health club facilities. 923 S.W.2d at 332. The plaintiff "had signed a two-page, seventeen-paragraph 'Retail Installment Contract' containing a general exculpatory clause." *Id.* The Supreme Court held that the clause was ambiguous and that the club "did not insulate itself from liability for future negligence because the exculpatory clause did not use the word 'negligence' or 'fault' or their equivalents so that a clear and unmistakable waiver occurred." *Id.* In reaching this decision, the Supreme Court noted that "[h]istorically, Missouri appellate courts have required that a release from one's own future negligence be explicitly stated." *Id.* at 336. The Supreme Court concluded that:

> [T]he best policy is to follow our previous decisions and those of other states that require clear, unambiguous, unmistakable, and conspicuous language in order to release a party from his or her own future negligence. The exculpatory language must effectively notify a party that he or she is releasing the other party from claims arising from the other party's own negligence. Our traditional notions of justice are so fault-based that most people might not expect such a relationship to be altered, regardless of the length of an exculpatory clause, unless done so explicitly. General language will not suffice.

*Id.* at 337.

Applying its holding, the court held that the clause at issue used the terms "*any* damages," "*any . . .* injuries," and "*any* and *all* claims, demands, damages, rights of

action, present or future . . . [] arising out of the Member's . . . use . . . of said gymnasium

. . ." was "ambiguous because it did not specifically state that a member was releasing

[the club] for its own future negligence." *Id.* The court concluded that:

> The better rule is one that establishes a bright-line test, easy for courts to apply, and certain to alert all involved that the future "negligence" or "fault" of the party is being released. ***The words "negligence" or "fault" or their equivalents must be used conspicuously so that a clear and unmistakable waiver and shifting of risk occurs***. There must be no doubt that a reasonable person agreeing to an exculpatory clause actually understands what future claims he or she is waiving.

*Id.* at 337-38 (emphasis added).

Paragraph 7 of the pipeline permits does not satisfy the requirements of *Alack*.

Paragraph 7 contains five clauses:

> [1.] Permittee shall and hereby *releases* and discharges Burlington of and from ***any and all liability for damage*** to or destruction of said Facility, and any other property of Permittee located on or near Burlington's premises,
>
> [2.] and [Permittee] shall and hereby assumes any and all liability for injury to or death of any and all persons whomsoever, including officers, employees, and agents of the parties hereto, and loss of or damages to property to whomsoever belonging, including property owned by, leased to, or in the care, custody, and control of the parties hereto, ***in any manner arising from or during*** the excavation for, construction, reconstruction, use, maintenance, repair, or removal of said Facility, however such injury, death, loss, damage, or destruction aforesaid may occur or be caused,
>
> [3.] and [Permittee] shall and hereby does indemnify and save harmless Burlington of and from any and all claims, demands, suits, actions, damages, recoveries, judgments, costs, or expenses arising or growing out of or in connection with any such injury, death, loss, damage, or destruction aforesaid.
>
> [4.] Permittee further agrees to appear and defend in the name of Burlington any suits or actions at law brought against Burlington on account of any such personal injury or death, and loss and damage to or destruction of

9

property, and to pay and satisfy any final judgment that may be rendered against Burlington in any such suit or action.

[5.] THE LIABILITY ASSUMED BY PERMITTEE SHALL NOT BE AFFFECTED BY THE FACT, IF IT IS A FACT, THAT THE LOSS, DAMAGE, DEATH, OR INJURY WAS OCCASIONED BY OR CONTRIBUTED TO BY THE *NEGLIGENCE* OF BURLINGTON, ITS AGENTS, SERVANTS, EMPLOYEES, OR OTHERWISE.

(Emphasis added.)

The first clause plainly addresses the subject of Big Lake's release of claims for its own damages, and releases Burlington. The second clause addresses the subject of Big Lake's assumption of liability, and by its plain terms comes into play only where loss or damage to someone other than Big Lake is caused by use of, or work of some sort on, the water line, a factual scenario not implicated in this case. The third and fourth clauses address Big Lake's obligation to indemnify and defend Burlington for claims of third parties arising from loss or damage described in the second clause. The fifth clause refers to the "liability assumed" by Big Lake, and thus to the second clause, and states that Big Lake's assumed liability will be unaffected by the negligence of Burlington or others.

Plainly, the second, third, fourth and fifth clauses of paragraph 7 of the pipeline permits are not applicable to this case. Each addresses the subject of Big Lake's assumption of liability, and thus its indemnity obligation. Indemnity and release are "distinct legal concepts." *Tri-State Gas Co. v. Kansas City Southern Ry. Co*., 484 S.W.2d 252, 254 (Mo. 1972). A contract of release extinguishes liability, where a contract of indemnity merely shifts liability from one party to another. *Alack*, 923 S.W.2d at 338. Thus, the use of the word "negligence" in the fifth clause of paragraph 7 applies only to

10

Big Lake's indemnity obligation for damages claimed by third parties, and operates to restrain Big Lake's right to shift its assumed liability back to Burlington or others indemnified. The reference to "negligence" in the fifth clause does not refer or apply to the release language in the first clause of paragraph 7, the only clause which addresses claims asserted by Big Lake for its own damages. *Gottschalk v. Consolidated R.R. Corp.*, 469 F.Supp. 254, 257-58 (S.D.N.Y. 1979) (use of the word negligence in exculpatory clause referred only to indemnification obligation and not to release and that usage establishes that when the parties intended to cover liability for negligence they said so directly).

The first clause releases Burlington (now BNSF) from liability for damage to "said Facility" (Big Lake's water line) or to any other property belonging to Big Lake "located on or near" BNSF's premises. The release language does not use the words "'negligence' or 'fault' or their equivalents . . . so that a clear and unmistakable waiver and shifting of risk occurs." *Alack,* 923 S.W.2d at 337. The release clause in Paragraph 7 does not meet the *Alack* requirements.[6]

The Respondents counter that *Alack* does not apply where sophisticated parties negotiate a release at arm's length. It is true that *Alack* acknowledged that, "This case does not involve an agreement negotiated at arm's length between equally sophisticated commercial entities. Less precise language may be effective in such situations, and we reserve any such claims." 923 S.W.2d at 338 n.4. The Supreme Court's later holdings in

---

[6]We acknowledge that Respondents do not agree with our conclusion that the fifth clause of paragraph 7 of the permits does not modify the first clause. Without conceding the point, Respondents did acknowledge during oral argument that the first clause of paragraph 7 of the permits, standing alone, violates *Alack*.

11

*Purcell Tire and Rubber Co., Inc. v. Executive Beechcraft, Inc.*, 59 S.W.3d 505 (Mo. banc 2001) and *Utility Service and Maintenance Inc. v. Noranda Aluminum, Inc.*, 163 S.W.3d 910 (Mo. banc 2005) solidified that the holding in *Alack* does not apply to a release negotiated between "equally sophisticated commercial entities."

In *Purcell,* the plaintiff decided to buy a used airplane and hired Beechcraft to perform a pre-purchase survey of the plane for the price of $1,250.00. 59 S.W.3d at 507-08. The last paragraph of the contract provided that Beechcraft's liability, if any, under the contract was limited to the cost of services performed and that the parties agree to indemnify and hold harmless Beechcraft from any damages or expenses claimed by any party to the contract beyond the cost of the services. *Id.* at 508. Purcell later discovered an oil leak that Beechcraft did not mention. *Id*. Purcell sued Beechcraft for breach of contract and negligence seeking damages in the amount of $372,458. *Id.* Beechcraft moved for summary judgment citing the affirmative defense that the contract limited liability to $1,250.00. *Id.* The trial court granted summary judgment in favor of Beechcraft. *Id.*

On appeal, the Supreme Court began its analysis by observing that both Purcell and Beechcraft are "***sophisticated businesses that contracted at arm's length***." *Id.* The Court noted that Purcell "is the 16th or 17th largest retail tire chain in America--ranks in the top four commercial tire dealers and retread providers in the country," and that Purcell's "president, a former pilot, has been involved in 15 plane purchases and 14 pre-purchase inspections." *Id*. The Court observed that "Beechcraft, a general aviation business, performs pre-purchase surveys for plane buyers," and "also performs more

12

stringent inspections . . . consistent with manufacturers' or Federal Aviation Administration standards." *Id.* The Court held that "[s]ophisticated parties have freedom of contract--even to make a bad bargain, or to relinquish fundamental rights," including "contractually limit[ing] future remedies. *Id.* The Supreme Court thus concluded that "[s]ophisticated businesses that negotiate at arm's length may limit liability without specifically mentioning 'negligence,' 'fault,' or an equivalent." *Id.* at 509 (citing *Alack*, 923 S.W.2d at 338 n.4).

This conclusion did not mean the exculpatory clause in *Purcell* was automatically enforceable. The clause remained subject to a claim that it was otherwise unenforceable because of ambiguity. Purcell argued that the liability limitation was also ambiguous because it encompassed "any" damages or injuries, including claims that cannot be released in advance as a matter of public policy in Missouri. *Id.* at 510. Purcell relied on *Alack*, where the Supreme Court held:

> Additionally, there is no question that one may never exonerate oneself from future liability for intentional torts or for gross negligence, or for activities involving the public interest. Yet the words used here would purport to include these claims which cannot be waived. Although these claims were not asserted here, they demonstrate the ambiguity of the contractual language.

923 S.W.2d at 337. In rejecting this argument, the Court in *Purcell* found that "[l]anguage that is ambiguous to an unsophisticated party may not be ambiguous to a sophisticated commercial entity. Beechcraft and Purcell Tire were ***sophisticated***

13

***businesses, experienced in this type of transaction.   In this commercial context no ambiguity exists***." *Id.* at 510-11 (citations omitted) (emphasis added).[7]

*Noranda* involved an indemnity provision in a contract between two businesses which provided that, "Seller shall indemnify and save Purchaser free and harmless from and against any and all claims, damages, liabilities or obligations of whatsoever kind . . . ."   163 S.W.3d 910, 911.   Following a bench trial, the trial court held that the provision was not enforceable.  *Id.* at 912.   On appeal, the Supreme Court acknowledged that in its review of release clauses in contracts, it ***"has drawn a distinction between contracts with consumers and contracts between businesses of equal power and sophistication***."  *Id.* at 913.

It is thus clear that a different standard applies to determine whether general exculpatory clauses or indemnity clauses can cover claims of future negligence depending upon whether the parties to the contract are "sophisticated businesses, experienced in this type of transaction." *Purcell*, 59 S.W.3d at 510-11.  Here, the parties disagree on the subject of who bore the burden to prove, or disprove, the "sophisticated parties" exception mentioned in *Alack* and formalized in *Purcell*.  No Missouri case has addressed this precise question.

"Release is an affirmative defense and it is a well settled general rule that the burden of proof to establish affirmative defenses is on the defendant from the beginning

---

[7]*Purcell* thus limited *Alack's* holding that a release clause is "ambiguous" merely because it *could* include claims that cannot be the subject of future release to contracts that are not between sophisticated parties.  The court in *Purcell* was not required to determine, however, whether sophisticated parties can permissibly contract to release claims of the type mentioned in *Alack* as ineligible for future release, as the plaintiff in *Purcell* only asserted claims for negligence and for breach of contract.

and remains upon him throughout the case." *Jenkins v. Simmons*, 472 S.W.2d 417, 420 (Mo. 1971). Thus, a defendant relying on a contract of release bears the burden of proof on each of the essential elements of a contract claim, including entry into the release in exchange for consideration, and that the circumstances at issue are within the scope of the release. *See State ex rel. Normandy Orthopedics, Inc. v. Crandall,* 581 S.W.2d 829, 834 (Mo. banc 1979) (holding that burden of persuasion does not shift merely because execution of release is established, and wrongdoer remains obligated to establish that release intended to discharge him if he is unnamed); *Nigro v. St. Joseph Medical Center*, 371 S.W.3d 808, 821 (Mo. App. E.D. 2012) ("In order to prove the defense of release, defendants must show that the plaintiff intended to release them from the liability for the subject conduct and that the plaintiff used clear, precise, and unequivocal language in doing so."); *Ensminger v. Burton*, 805 S.W.2d 207, 217 (Mo. App. W.D. 1991) ("[R]elease [is an] affirmative defense[] and the risk of non-persuasion rests upon the defendant to prove the terms of agreement as well as its execution."); *Woodford v. Illinois Central Gulf Railroad Co.*, 518 S.W.2d 712, 716 (Mo. App. 1974) ("[A] material element of defendant's release theory [is] that the release covered the injuries that plaintiff is now suing for.").

There is only one "exception to the general rule in regard to releases in that where the execution of a release purporting to rest on [] consideration is admitted the burden is on the plaintiff to prove some invalidity in the release." *Jenkins*, 472 S.W.2d at 420. "Invalidity" refers to the legal enforceability of the release. *See, e.g., Angoff v. Mersman*, 917 S.W.2d 207, 211 (Mo. App. W.D. 1996) ("To avoid an affirmative defense alleged in

15

an answer, a plaintiff must plead specifically matters of affirmative avoidance," such as fraud, mistake or unfair dealing); *Landmark North County Bank & Trust Co. v. National Cable Training Centers, Inc.*, 738 S.W.2d 886, 890 (Mo. App. E.D. 1987) (holding that the burden to prove invalidity effecting enforceability of a release shifts to the party opposing the defense).

The Respondents correctly argue that once Big Lake admitted execution of the permits, and thus of the release, the burden shifted to Big Lake to "prove some invalidity in the release." *Jenkins*, 472 S.W.2d at 420. Big Lake argued in its response to the motion for summary judgment that the release was facially invalid pursuant to *Alack* because it released future negligence without express reference to same, and it released future intentional torts and gross negligence. Unlike scenarios where fraud, mistake, unfair dealing, or other similar defenses to enforcement of a release are alleged, Big Lake's assertion of legal invalidity was established without the requirement of further evidence. *Cf. Landmark North County Bank & Trust Co.*, 738 S.W.2d at 890 (holding that bank president's bare allegations that release was invalid because it was induced by fraudulent misrepresentation and duress would not defeat summary judgment in absence of facts in dispute that would establish these claims).

Once Big Lake "prove[d] some invalidity in the release," *Jenkins*, 472 S.W.2d at 420, we conclude that the burden shifted back to the Respondents to prove that the release fell within the exception for contracts between "sophisticated parties." Where established precedent renders the terms of a contract facially invalid, logic dictates that the burden to salvage the contract must rest with the party seeking its enforcement.

16

The Respondents have not met this burden, and have thus failed to establish a right to summary judgment as a matter of law. In the suggestions in support of their motion for summary judgment, the Respondents summarily stated that "the Pipeline Permits were negotiated between two sophisticated parties." Though no Missouri court has declared the subject of this statement to be a question of fact, we believe the proposition to be self-evident. In *Purcell,* the Supreme Court went to great lengths to set forth the apparently uncontroverted credentials of the parties before concluding that the parties were sophisticated businesses in the "***type of transaction***"[8] involved in the case. 59 S.W.3d at 510-11 (emphasis added).[9] Similarly, in *Caballero v. Stafford*, 202 S.W.3d 683, 695 n.2 (Mo. App. S.D. 2006), the Southern District reversed a trial court's determination that *Alack* did not apply to the release provision at issue because "we can find nothing in the record supporting the proposition that Caballero is a sophisticated commercial entity." Other jurisdictions have expressly held that the level of sophistication of a party is question of fact, not a question of law. *See First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 823 N.E.2d 168, 181 (Ill. App. 2005) ("[T]he plaintiff's level of sophistication . . . [is a] question[] of fact for the trier of fact to determine."); *Appletree Square I Ltd. Partnership v. Investmark, Inc.*, 494 N.W.2d 889,

_____

[8]The Supreme Court's reference to the "type of transaction" as relevant in determining sophistication of the parties to a contract suggests that a person or entity may be "sophisticated" in one contract negotiation, but not in another. Thus, it is not merely the characterization of a contracting party as a business, commercial entity or governmental entity that disposes of the question of sophistication. Rather, all relevant facts must be considered, including the party's relative bargaining power and experience in the subject matter of the contract.

[9]In the face of uncontroverted facts as to the sophistication of the entities involved, we understand the corresponding conclusion of the Supreme Court that the parties before it were "sophisticated." "A question of fact exists only when fair-minded people, exercising reasonable judgment, could reach different conclusions on the issue in controversy. When reasonable minds could not differ, summary judgment is properly granted." *Binkley v. Palmer*, 10 S.W.3d 166, 171 (Mo. App. E.D. 1999) (citations omitted). Here, as we explain in our ruling, the "sophistication" of the parties is not at all uncontroverted, materially distinguishing the present case from the undisputed facts of *Purcell* on that topic."

17

894 (Minn. App. 1993) ("The unique qualifications of the buyers and sellers in this case create questions of fact regarding the relative sophistication of the parties. The fact-finder must weight this evidence to determine whether the buyers' reliance on disclosures was reasonable."); *McGeorge v. Van Benschoten*, 1988 WL 163063 *7, No. Civ. 87-1050 PHX CAM) (D. Ariz. Dec.8, 1988) (not reported in F. Supp.) (the party's lack of sophistication raises a question of fact precluding judgment as a matter of law). *See also* Meredith R. Miller, *Contract Law, Party Sophistication and the New Formalism*, 75 Mo. L. Review 493, 494-96, 520 (2010) (examining the need for courts to define sophistication; noting that the extensive contract treatises of Williston, Corbin and Farnsworth do not clarify what is meant by the term; and argues that because the level of sophistication is treated as a question of fact, a "more exacting analysis (rather than unstated presumptions)" would provide better results; "the court should apply a rigorous fact-driven analysis to determine whether assignment of the sophistication label is appropriate.")[10]

Here, the uncontroverted facts in Respondents' summary judgment motion are devoid of *any* facts from which the trial court could have concluded as a matter of law that the pipeline permits were negotiated at arm's length between business or commercial entities of equal power and sophistication in such transactions. The Respondents' uncontroverted facts state only that Big Lake is "a Missouri municipality." The Respondents cite to no authority suggesting that this admitted fact supports the

---

[10]This article lists a series of cases where government or quasi-public entities were treated as sophisticated parties. However those cases do not reflect the facts the courts relied on in making their determinations, and do not hold that governmental entities are sophisticated parties to a contract as a matter of law. 75 Mo. L. Review at 523 n.169.

conclusion as a matter of law that the pipeline permits were negotiated between parties sophisticated in such transactions.[11]

"'The movant bears the burden of establishing both a legal right to judgment and the absence of any genuine issue of material fact required to support the claimed right to judgment.'" *Dilley*, 401 S.W.3d at 550 (quoting *Kinnaman-Carson v. Westport Ins. Corp.*, 283 S.W.3d 761, 765 (Mo. banc 2009)). "The defendant establishes the right to judgment as a matter of law by showing . . . facts necessary to support his properly pleaded affirmative defense." *Jordan*, 409 S.W.3d at 557. A motion for summary judgment must be denied if the factual assertions are insufficient to entitle the movant to judgment as a matter of law. *Id.* The Respondents have not established that Big Lake was a sophisticated party in connection with the negotiation and execution of the permits, and thus has not established all facts essential to their right to judgment on the affirmative defense of release as a matter of law.[12] *Jordan*, 409 S.W.3d at 557.

---

[11]Big Lake responded to the bare assertion in the respondents' suggestions by summarily arguing that it was not a sophisticated party. Big Lake was not required to set forth issues of material fact in genuine dispute in the manner required by Rule 74.04(c)(2) to contest a subject not fairly raised in the Respondents' uncontroverted facts and as to which Big Lake did not bear the burden of proof.

[12]Big Lake also argued to the trial court that the release clause in paragraph 7 of the permits is ambiguous because it releases Burlington for damages to "said Facility" or "other property" belonging to Big Lake "on or near Burlington's premises." Big Lake argued that it is unclear whether the damaged fire hydrant and the five breaks in the water line are damages to "said Facility," or "on or near Burlington's premises," particularly in light of its allegations that the damages occurred some distance from BNSF's tracks. The uncontroverted facts in the Respondents' motion did not identify the "premises" covered by the permits, and do not address where the damages occurred in relation to those "premises" consistent with the intent of the parties to the permits. We express no opinion on this point other than to note that the discussion suggests another obstacle to the entry of summary judgment as a matter of law on the affirmative defense of release. *See Alack*, 923 S.W.2d at 334 ("[C]ontracts exonerating a party from future acts of negligence are to be 'strictly construed against the party claiming the benefit of the contract, and clear and explicit language in the contract is required to absolve a person.'") (citation omitted). The Respondents have the burden to establish that the paragraph 7 of the permits includes within its scope damages to the water line and the fire hydrant given the alleged location of the damages in relation to BNSF's tracks, and the definition of "Facility" in the permits. *See Woodford*, 518 S.W.2d at 716 (holding that it is a material element of the affirmative defense of release to establish that "the release covers the injuries that plaintiff is now suing for").

Similarly, the release clause in paragraph 7 "releases and discharges Burlington." Big Lake admitted as an uncontroverted fact that BNSF is the successor to Burlington. However, the uncontroverted facts do not address

Point one is granted, requiring reversal of the trial court's entry of summary judgment. As a result, we need not address whether this release can permissibly operate to release Big Lake's claims of trespass and gross negligence, the subjects of Big Lake's second and third points relied on.[13] Nor are we required to address whether the Respondents permissibly raised the affirmative defense of release in a motion for summary judgment filed in lieu of an answer to the petition, the subject of Big Lake's fourth point relied on.

## Conclusion

We reverse the trial court's entry of summary judgment and remand this matter to the trial court for further proceedings consistent with this Opinion.

_____
Cynthia L. Martin, Judge

All concur

---

how or why Massman is covered by the release clause. BNSF argued to the trial court that the "all caps" language in paragraph 7 (what we refer to in this Opinion as clause 5) extends the scope of the release clause to Massman because it refers to Burlington's agents. We have explained, however, that clause 5 in paragraph 7 of the permits applies only to Big Lake's indemnity obligations, and not to the release clause. It will thus remain the Respondents' obligation on remand to establish that Massman is covered by the release clause. *See Alack*, 923 S.W.2d at 334 ("It is a 'well-established rule of construction that a contract provision exempting one from liability for his or her negligence will never be implied but must be clearly and explicitly stated.'") (citation omitted); *State ex rel. Normandy Orthopedics, Inc.*, 581 S.W.2d at 834 (holding wrongdoer must establish he is within the intended scope of a release where he is not expressly named).

[13] *See* footnote number 7.