

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| MARK GERAN, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | WD77507 |
| | ) | |
| XEROX EDUCATION SERVICES, | ) | Opinion filed:  May 19, 2015 |
| INC., | ) | |
| | ) | |
| Respondent. | ) | |

**APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI**
**THE HONORABLE ROBERT M. SCHIEBER, JUDGE**

Before Division Two:  Lisa White Hardwick, Presiding Judge,
Victor C. Howard, Judge and Cynthia L. Martin, Judge

Mark Geran appeals from the summary judgment in favor of Xerox Education Services, Inc. (XES), a loan servicer, in his suit for damages for violations of the Missouri Merchandising Practices Act and for intentional infliction of emotional distress.  The judgment is affirmed.

## Factual and Procedural Background

Mr. Geran took out various student loans with Norwest Bank for his law school education between 1997 and 2000, and Wells Fargo Education Financial Services became the holder of the promissory notes relating to those loans.  In 2005, Mr. Geran applied for and entered into an agreement with Wells Fargo to consolidate all of his student loans and executed a Promissory Note in favor of Wells Fargo promising to repay that consolidated loan.  Mr. Geran applied for

an income sensitive repayment plan but was placed on a graduated repayment plan that provided for interest only payments for one-third of the repayment period and a level monthly payment for the remaining two-thirds of the repayment period. On March 18, 2005, Wells Fargo mailed Mr. Geran a Disclosure Statement and Repayment Schedule for the consolidated loan. It showed that the consolidated loan consisted of two accounts for subsidized and unsubsidized portions and set out the specific repayment plan—100 payments of $160.41/month total for both accounts beginning April 2005 and then the remaining 200 payments of $345.55/month beginning in August 2013. The Promissory Note provided that terms of the Disclosure Statement and Repayment Schedule were made part of the loan:

> At or about the time my Federal Consolidated Loan is disbursed, a disclosure statement and repayment schedule ("disclosure") will be provided to me. This disclosure will identify my Federal Consolidated Loan amount and additional terms of the loan….If the information in this Note conflicts with information in the disclosure, the specific terms and information in the disclosure apply to my loan.

Similarly, the Disclosure Statement and Repayment Schedule provided, "This document will become an attachment to, and a part of, your Consolidated Loan Application/Promissory Note. Mr. Geran had the ability at any time under the Promissory Note and the Disclosure Statement and Repayment Schedule to request a change in his repayment plan, but Wells Fargo was not obligated to grant such request. Specifically, the Disclosure Statement and Repayment Schedule provided, "You must repay your loan according to the scheduled payments described below, unless the lender of your Consolidated Loan agrees to other terms." Additionally, the Promissory Note provided that the lender "may allow" a forbearance (temporary delayed or reduced loan payments) if the borrower is unable to make scheduled loan payments.

In 2011, Wells Fargo contracted with ACS Education Services, Inc. (ACS), which was later acquired by XES in 2012, to service Mr. Geran's consolidated loan. On March 23, 2011,

2

ACS sent Mr. Geran a letter informing him that it could not accommodate the graduated payment plan that he was on with Wells Fargo and gave him an option to request a graduated plan offered by ACS or be placed on level payments. Specifically, the letter provided:

> ACS has determined that your account(s) was approved for a graduated repayment plan while being serviced by Wells Fargo Education Financial Services. While ACS offers graduated repayment plans, we cannot accommodate the identical plan you previously selected at Wells Fargo Education Financial Services. We do offer a similar plan with a tiered repayment schedule where the payment amount gradually increases every 24 months. If you would like to choose this repayment plan, please complete the bottom portion of this letter and send the entire letter to the following address by 5/22/2011….

It was undisputed that Mr. Geran called ACS on May 23, 2011, regarding the repayment plan change. Mr. Geran alleged that the customer service representative estimated that his monthly payment amount under the new tiered repayment schedule would be $154.81 within plus/minus ten percent. ACS admitted that the customer service representative provided Mr. Geran with an estimate but denied the amount. It also presented documents showing that Mr. Geran requested information on his debt and interest rate, requested to be placed on ACS's tiered repayment schedule, and was told to put his request in writing during the phone call. That day, Mr. Geran returned by fax and mail the March 23, 2011 letter requesting to be placed on ACS's tiered repayment plan. The request was signed by Mr. Geran on May 22, 2011.

On April 9, 2011, ACS received a copy of Mr. Geran's Promissory Note and became aware that the specific terms of the repayment plans were set out in the form Promissory Note while most other lenders would only list the generic graduated payment definition. Consequently, ACS and Wells Fargo decided that ACS needed to change its system to accommodate the repayment plans set out in the Promissory Note. Wells Fargo and ACS entered into a change order in this regard dated July 14, 2011.

3

In the meantime, in June 2011, ACS sent Mr. Geran two Loan Consolidation Disclosure Statement and Repayment Schedules for the two accounts under the consolidated loan. They set out the specific repayment plans under the new ACS tiered repayment plan. The first payment beginning June 28, 2011, for both accounts of the consolidated loan was $204.03 ($93.02 for subsidized part plus $111.01 for unsubsidized part) and increased as follows: $244.96/month beginning June 28, 2013; $294.09/month beginning June 28, 2015; $353.07/month beginning June 28, 2017; $423.89/month beginning June 28, 2019; $508.91/month beginning June 28, 2021; $610.99/month beginning June 28, 2023; and a single final payment of $552.99 due on March 28, 2025.

ACS had sent out a billing statement under the prior graduated repayment plan dated May 31, 2011, for the June 28 payment due of $160.41. Thereafter, it sent Mr. Geran two new billing statements dated June 7, 2011, one for each account under the consolidated loan, for a new total of $204.03 due on June 28, 2011. Mr. Geran sent ACS a payment of $180 on June 28, 2011. On July 10, 2011, ACS sent Mr. Geran a past due reminder. Mr. Geran sent ACS a payment of approximately $160 on July 23, 2011. On July 31, 2011, ACS sent Mr. Geran a delinquency notice assessing late charges.

Mr. Geran phoned ACS on August 10, 2011, to inquire about his account and the delinquent status. A few days later on August 16, 2011, Mr. Geran sent a letter to ACS disputing the delinquency on his loan and further disputing the "current monthly payment amount scheduled by lender/holder." Mr. Geran complained that "ACS breached the existing agreement between the previous lender, Wells Fargo, and myself by stating an intention to modify the existing agreement;" "ACS failed to properly apply payments made to lender/holder in accordance with statements received by debtor;" and "ACS is [sic] represented that payment

4

amounts that would result from enrolling in its graduated repayment plan, and that ACS had the right to change payments if debtor did not enroll in the graduated repayment plan." On August 19, 2011, ACS received and credited a payment of $228.89 that brought Mr. Geran's loan current and resolved the deficiency. Thereafter, ACS notified Mr. Geran that the late charges were reversed.

ACS responded by letter to Mr. Geran's written complaint on September 1, 2011. It explained that the new monthly payment effective June 28, 2011, was $204.03 and that it received from him a payment of $180 on June 26, 2011, which resulted in his account being past due and the assessment of a late charge. The letter further advised, "If you would like to be placed on the prior services payment plan you can submit your request and it will be taken under consideration." Mr. Geran did not request to be placed back on this initial graduated repayment plan and made payments under the new ACS tiered repayment plan for the next year and a half through April 2013.

On March 14, 2013, Mr. Geran filed his petition in this matter against XES, which acquired ACS in April 2012. Count I through VI alleged violations of the MMPA. Specifically, Mr. Geran alleged: (1) ACS's Misrepresentation of Right and Authority to Modify Plaintiff's Repayment Obligation and Statement of Coercion (Count I); (2) ACS's Misrepresentation of Eligibility to Remain on Existing Agreement and Monthly Payment Amount under ACS's Graduated Repayment Plan (Count II); (3) ACS's Fraudulent Billing and Requiring of Plaintiff to Make Payments of Amounts in Excess of ACS's Representations and Plaintiff's Federal Consolidation Loan Disclosure Statement and Repayment Schedule (Count III); (4) ACS's Scheme of Deceptive, Confusing and Misleading Billing Statements and Design to Create Delinquency of Plaintiff's Account (Count IV); (5) ACS's Unlawful Assessment of Late Fees

(Count V); and (6) Unfair Application of Payment Amounts Received by ACS (Count VI).

In Count VII for defamation/libel, Mr. Geran alleged that ACS published and communicated defamatory information about his account to third parties.

In Count VIII for intentional infliction of emotional distress, Mr. Geran alleged that ACS acted in an intentional manner and or intended to cause him to suffer severe emotional distress in asserting its right to modify the repayment schedule and in refusing to adequately address his complaints by telephone and letter and his consumer complaint filed with the Missouri Attorney General's officer. He further alleged that ACS's conduct proximately caused him substantial anxiety, depression, embarrassment, frustration, and humiliation in relation to credit reporting, reputation, and standing; exacerbation of his preexisting condition and symptoms of post traumatic stress disorder, anxiety disorder, and depression; and substantial financial hardship, anxiety, depression, frustration, and physical harm and discomfort related to his diminished ability to meet household and utility expenses.

XES filed a motion for summary judgment arguing that Mr. Geran's six counts for violation of the MMPA failed to state a claim against it because it is a loan servicer, was a stranger to Mr. Geran's 2005 loan transaction with Wells Fargo, did not sell any goods or services to Mr. Geran, and there was no sales transaction between it and Mr. Geran. In making this argument, XES relied on *State ex rel. Koster v. Portfolio Recovery Assocs., LLC*, 351 S.W.3d 661 (Mo. App. E.D. 2011), and other federal decisions following it. In *Koster*, the Eastern District upheld the dismissal of MMPA claims against a third-party debt collector who was not a party to the original consumer transaction. *Id.* at 668. It held that "actions occurring after the initial sales transaction, which do not relate to any claims or representations made before or at the time of the initial sales transaction, and which are taken by a person who is not a

6

party to the initial sales transaction," are not made "in connection with" the sale as required by the MMPA. *Id.* at 667.

XES further argued that it was entitled to summary judgment on Mr. Geran's defamation/libel claim because it did not publish the statements alleged to be defamatory to any third party. Finally, XES argued that it was entitled to summary judgment on the intentional infliction of emotional distress claim because (1) Mr. Geran's claims were limited to contract under the terms of the Promissory Note with Wells Fargo, and tort claims were barred pursuant to the economic loss doctrine, and (2) Mr. Geran could not prove that ACS's conduct was extreme and outrageous or that the conduct was done solely to inflict extreme emotional harm on him.

Mr. Geran filed a response to the motion for summary judgment and a statement of additional material facts that remained in dispute. It argued that *Koster* was distinguishable and inapplicable to this case and that the March 2011 change of the repayment schedule constituted a new sale covered under the MMPA.

The trial court granted XES's motion for summary judgment and entered judgment in its favor on all of Mr. Geran's claims. This appeal by Mr. Geran followed.

**Standard of Review**

Appellate review of the grant of summary judgment is *de novo*. *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). Summary judgment will be upheld on appeal if the movant is entitled to judgment as a matter of law and no genuine issues of material fact exist. *Id.* at 377. The record is reviewed in the light most favorable to the party against whom judgment was entered, according that party all reasonable inferences that may be drawn from the record. *Id.* at 376. Facts contained in affidavits or

7

otherwise in support of a party's motion are accepted as true unless contradicted by the non-moving party's response to the summary judgment motion. *Id.*

A defending party may establish a right to judgment as a matter of law by showing any one of the following: (1) facts that negate any one of the elements of the claimant's cause of action, (2) the non-movant, after an adequate period of discovery, has not and will not be able to produce evidence sufficient to allow the trier of fact to find the existence of any one of the claimant's elements, or (3) there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly-pleaded affirmative defense. *Id.* at 381.

Once the movant has established a right to judgment as a matter of law, the non-movant must demonstrate that one or more of the material facts asserted by the movant as not in dispute is, in fact, genuinely disputed. *Id.* The non-moving party may not rely on mere allegations and denials of the pleadings, but must use affidavits, depositions, answers to interrogatories, or admissions on file to demonstrate the existence of a genuine issue for trial. *Id.*

**MMPA Claims**

In his first point on appeal, Mr. Geran contends that the trial court erred in granting XES's motion for summary judgment on his MMPA claims. He asserts that the summary judgment in favor of XES was in contravention to the recent Missouri Supreme Court case, *Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410 (Mo. banc 2014), which abrogated the *Koster* case relied on by XES in its motion for summary judgment. He further asserts XES was not entitled to judgment as a matter of law and genuine issues of material fact existed because the 2011 change of the repayment schedule constituted a new sale bringing his claims under the MMPA.

8

The MMPA makes unlawful "[t]he act, use or employment…of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." § 407.020, RSMo Cum. Supp. 2013. After summary judgment was entered in this case and during the pendency of this appeal, the Missouri Supreme Court issued two opinions that considered when an act by a loan service provider, who was not a party to the initial loan transaction, is "in connection with" a sale so as to be actionable under the MMPA. *See Conway*, 438 S.W.3d 410, and *Watson v. Wells Fargo Home Mortg., Inc.*, 438 S.W.3d 404 (Mo. banc 2014). Generally, a change in the law by judicial decision is to be given retroactive effect. *Sumners v. Sumners*, 701 S.W.2d 720, 723 (Mo. banc 1985). "[I]f, subsequent to the judgment, and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied." *Id.* (internal quotes and citation omitted). Two exceptions exist to the general rule of retroactivity. "The first exception is found when the change pertains to procedural as opposed to substantive law." *Id.* "The second exception turns on the issue of fundamental fairness and is often expressed as a question of reliance." *Id.* "If the parties have relied on the state of the decisional law as it existed prior to the change, courts may apply the law prospectively-only in order to avoid injustice and unfairness." *Id.* Neither exception applies in this case, therefore, *Conway* and *Watson* are given retroactive effect here.

In *Conway*, homeowner plaintiffs appealed the dismissal of their MMPA claim against the defendants, the assignee of the mortgage loan and the loan servicer, for wrongful foreclosure of a deed of trust. 438 S.W.3d at 412. The Missouri Supreme Court considered the meaning of the statutory phrase "in connection with" and the purpose of the MMPA and reversed. *Id.* at 414.

9

It first explained that "a loan is an agreed upon bundle of services being 'sold' by the lender to the borrower." 438 S.W.3d at 412. "It creates a long-term relationship in which the borrower and the lender continue to perform various duties, such as making and collecting payments over an extended period of time." *Id.* at 415. Because of these continuing duties, the sale of a loan "continues throughout the time the parties perform their duties." *Id.* "A party's right to collect a loan is part of that sale and is, therefore, 'in connection with' the loan." *Id.*

Next, the Court explained that because the MMPA was enacted to supplement the common law definition of fraud, no compelling reason existed to interpret "in connection with" to apply only when the entity engaged in the misconduct was a party at the time the transaction was initiated as required by *Koster*. *Id.* "[L]oan collection procedures, whether initiated by a loan originator or a loan servicer, are done 'in connection with' the original procurement of the loan." *Id.* at 416. Thus, the Court determined that homeowners sufficiently pleaded a claim under the MMPA because the defendants' alleged actions were "in connection with" the original loan. *Id.* at 417.

In *Watson*, decided the same day, the plaintiff alleged that the defendant loan servicer violated the MMPA in two ways—by wrongfully foreclosing on the deed of trust and by engaging in bad faith negotiations of a loan modification. 438 S.W.3d at 406. The trial court granted summary judgment in favor of the loan servicer. *Id.* With respect to the wrongful foreclosure allegations, the Missouri Supreme Court reversed following the analysis of *Conway*. *Id.* at 407. As to the bad faith negotiation claim, the Court affirmed the summary judgment finding that the loan servicer's actions in that regard were not "in connection with" the sale of the original loan. *Id.* at 408. It explained that the loan modification negotiations were not "a service the lender agreed to sell or the borrower agreed to buy when the parties agreed to the

10

loan." *Id.* "[T]he extent of [the bundle of services included in a loan] is fixed at the outset when the parties agree to the terms of the loan." *Id.* Because the deed of trust executed in the original transaction specifically stated that there was no obligation to engage in renegotiations, the loan servicer was not enforcing the terms of the loan in engaging in loan modification negotiations but rather contemplating creating a new agreement. *Id.* Importantly, the Court noted that the plaintiff had not argued at the trial court, and therefore the Court did not consider, whether the loan modification negotiations constituted a separate sale under the MMPA and that the loan servicers actions were "in connection with" the negotiations. *Id.* at 407 n.2. It suggested that after remand, the plaintiff may seek leave to file an amended petition that includes such claims. *Id.*

As in *Watson*, the renegotiation of the terms of repayment and the modification of the repayment schedule were not services the lender agreed to sell or the borrower agreed to buy when the parties agreed to the 2005 consolidated loan. While under the terms of the Promissory Note and the Disclosure Statement and Repayment Schedule, a borrower could request a new repayment plan, the lender was not obligated to grant such request. Modification of the repayment schedule was not included in the bundle of services of the 2005 loan. As such, ACS was not enforcing the terms of that loan in modifying the repayment schedule and thus ACS's actions surrounding the modification of the repayment schedule were not "in connection with" the consolidated loan. *See Wivell v. Wells Fargo Bank, N.A.*, 773 F.3d 887, 899, 899 n.2 (8th Cir. 2014)(dismissal of MMPA claims based on lender's alleged false statements with respect to the availability of a loan modification upheld where lender's conduct surrounding loan modification was not "in connection with" a sale because loan did not obligate the lender to negotiate or agree to a loan modification). *Compare May v. Nationstar Mortg.*, LLC, 2014 WL 6607191 (E.D. Mo.

2014)(loan servicer's motion to dismiss two MMPA counts denied where plaintiff's claims were not based on any conduct by defendant arising out of an unsuccessful loan modification effort but instead challenged the defendant's servicing of the original loan).

Mr. Geran argues that the March 2011 change of the repayment schedule constituted a new sale covered under the MMPA. Mr. Geran made this argument in his response to XES's motion for summary judgment and set forth additional facts on the issue that he claimed remained in dispute. However, his argument in the response was cursory, and his uncontroverted facts on the issue were legal conclusions. Legal conclusions set forth as uncontroverted facts in summary judgment pleadings are not binding on the other party or the court. *Village of Big Lake v. BNSF R. Co.*, 433 S.W.3d 460, 463 n. 3 (Mo. App. W.D. 2014). Furthermore, his petition did not allege that the change of the repayment schedule was a separate sale. The role of the pleadings is crucial to the adjudication of a valid summary judgment, as to any other judgment on the merits. *Coleman v. City of Kansas City*, 859 S.W.2d 141, 147 (Mo. App. W.D. 1993). "Pleadings define the issues and form the foundation of the process of adjudication and judgment." *Id.* In this case, the petition alleged misrepresentation and fraud by ACS surrounding the modification of the repayment schedule of the 2005 consolidated loan. The alleged unfair practices included ACS's misrepresentations regarding its authority under the loan to modify the repayment schedule, Mr. Geran's inability to remain on the original repayment schedule, and the new monthly payment, which led to Mr. Geran's enrollment in ACS's tiered repayment plan. The petition further alleged fraud and deception in ACS's billing, assessment of late fees, and how payments were applied to the loan under the new repayment schedule. The petition did not allege that ACS's conduct occurred in connection with a new sale. Accordingly, the trial court was not in a position to consider the new sale claim. Likewise, although able

12

appellate counsel did an excellent job arguing the claim on appeal, this theory has not been preserved for consideration by this court. *See Hibbs v. Berger*, 430 S.W.3d 296, 320-21 (Mo. App. E.D. 2014)(plaintiff could not base civil conspiracy claim on two new independent causes of action not pleaded in his petition and only mentioned in his response to defendant's motion for summary judgment). *See also Wivell*, 773 F.3d at 899 n.2 (plaintiff's alternative argument that the loan modification was a separate sale under the MMPA not addressed where complaint only alleged that lender's actions occurred "in connection with the servicing of the…mortgage"); *Groh v. JPMorgan Chase Bank, N.A.*, 2015 WL 58461 (W.D. Mo. 2015)(dismissal of MMPA claim based on lenders' failure to timely finalize loan modification agreement was upheld where allegations did not relate to any acts or omissions connected with original loan and amended petition did not allege a separate sale). The trial court did not err in entering summary judgment in favor of XES on Mr. Geran's claims for violation of the MMPA. Point denied.

### Intentional Infliction of Emotional Distress Claim

In his second and third points on appeal, Mr. Geran contends that the trial court erred in granting XES's motion for summary judgment on his claim for intentional infliction of emotional distress. In this count, Mr. Geran alleged that ACS's conduct in asserting its right to modify the repayment schedule and in refusing to adequately address his complaints was extreme, outrageous, intentional, and intended to cause him to suffer severe emotional distress. XES raised several grounds to support its motion for summary judgment on this claim, and Mr. Geran's two points challenge all of those grounds. The trial court granted summary judgment on this claim without explanation. Where the trial court grants summary judgment without specifying the basis for its order, it is presumed that the trial court based its decision on grounds specified in the motion for summary judgment. *Central Mo. Elec. Co-op. v. Balke*, 119 S.W.3d

13

627, 635 (Mo. App. W.D. 2003). An appellate court will affirm the grant of summary judgment if it could have been based on any theory raised in the motion and supported by the summary judgment record. *East Attucks Cmty. Housing, Inc. v. Old Republic Sur. Co.*, 114 S.W.3d 311, 324 (Mo. App. W.D. 2003).

To recover for intentional infliction of emotional distress, a plaintiff must show (1) the defendant's conduct was extreme and outrageous; (2) the defendant acted intentionally or recklessly; and (3) the defendant's conduct caused extreme emotional distress resulting in bodily harm. *Balke*, 119 S.W.3d at 636. Additionally, the plaintiff must demonstrate that the sole intent in acting was to cause emotional distress. *Id.* "Where a desire to cause severe emotional harm is not the sole motivation for the conduct alleged,…suit cannot be brought for intentional infliction of emotional distress." *Thomas v. Special Olympics Mo., Inc.*, 31 S.W.3d 442, 448 (Mo. App. W.D. 2000).

One of the grounds under which XES sought summary judgment was that Mr. Geran could not prove that ACS's sole motivation for its conduct surrounding the change of the repayment plan was to cause Mr. Geran emotional distress. In support of its motion for summary judgment and of its reply in support of its motion for summary judgment, XES offered two affidavits of Jamie Broedel, a member of the company's Financial Services Group and the corporate representative of XES. Mr. Broedel stated that, in sending the March 23, 2011 letter regarding changing Mr. Geran's repayment plan, ACS was simply processing the transfer of Mr. Geran's loan and was not intending any emotional harm to him. He also stated that ACS was servicing Mr. Geran's loan pursuant to its belief that it had the ability and right on behalf of Wells Fargo to modify the repayment plan. Mr. Broedel further stated that ACS received a copy of Mr. Geran's Promissory Note on April 9, 2011. XES also presented documents showing that

14

after receiving the Promissory Note, ACS learned that the Promissory Note listed specific repayment plans while most other lenders would only list the generic graduated payment definition. Consequently, ACS determined that it needed to create the repayment plans in the Promissory Note, and ACS and Wells Fargo entered into a change order in July 2011 to do so. Mr. Geran offered no evidence that disputed these facts or disproved XES's claim that, at the time of the modification to the repayment plan, ACS believed it had authority to change the repayment plan. The uncontradicted evidence indicated that ACS had a legitimate business purpose for its conduct surrounding the repayment modification. Mr. Geran could not establish that ACS acted with the sole motivation to cause emotional distress. *See Balke*, 119 S.W.3d at 636-38, and *Thomas*, 31 S.W.3d at 447-49 (where defendants set forth evidence that their actions were driven at least partially by legitimate reasons, and plaintiffs failed to contravene that evidence, plaintiffs failed to establish that defendants acted with the sole motivation to cause emotional distress, and summary judgments in favor of defendants were proper). The trial court did not err in entering summary judgment in favor of XES on the claim for intentional infliction of emotional distress. The points are denied.

The judgment is affirmed.[1]

_____
VICTOR C. HOWARD, JUDGE

All concur.

---

[1] Mr. Geran filed a contingent motion for attorney's fees on appeal under section 407.025.1, RSMo Cum. Supp. 2013, and the motion was taken with the case. Mr. Geran sought attorney's fees on appeal contingent upon his successfully winning the case on appeal and at trial. Under section 407.025.1, the MMPA authorizes a court to "award to the prevailing party attorney's fees, based on the amount of time reasonably expended." *Id.* "However, the statutory authorization of such attorney's fees award under the MMPA is conditioned upon the plaintiff prevailing in establishing actual damages under the MMPA." *Agnello v. Walker*, 306 S.W.3d 666, 679 (Mo. App. W.D. 2010). Mr. Geran does not prevail on this appeal; the motion is denied.